**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | |
|---|---|
| **RONITA WADE,** | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) **CIVIL ACTION NO. 2:19-cv-623-KD-MU** |
| | ) |
| **DARRIO MELTON, both in his individual** | ) |
| **and official capacity as Mayor of the City** | ) |
| **of Selma; and THE CITY OF SELMA** | ) |
| **Defendants.** | ) |

## ORDER

This matter is before the Court on Defendant Dario Melton's and Defendant City of Selma's motion for summary judgment (Doc. 16); Plaintiff Ronita Wade's Response (Doc. 21); and Defendants' Reply (Doc. 22).[1]

**I.**     **Findings of Fact**[2]

On September 4, 2014, the City Council of Selma appointed Plaintiff Ronita Wade (Wade) as the Treasurer of the City of Selma (the City). (Doc. 20-8; and see Doc. 20-6 (Ala. Code § 11-43-3) (authorizing the City Council to appoint certain positions such as City Treasurer)). Wade's responsibilities as Treasurer were delineated as follows:

---

[1] In Defendants reply, they argue that parts of Plaintiff's declaration are due to be stricken or disregarded and that the Declaration of Lashawn Gardiner is inadmissible. (Doc. 22 at 4; Doc. 20-4 (Lashawn Gardiner Declaration)). Gardiner's declaration was not referenced; Defendant's argument as to same is **MOOT**. Defendants also argue portions of Wade's declaration are due to be stricken or disregarded. (Doc. 22 at 1-3). Defendants' objections as to Wade's declaration are **DENIED**, except to the extent the declaration is conclusory, opinion or hearsay.

[2] At the summary judgment stage, the facts are taken in the light most favorable to the non-movant. Tipton v. Bergrohr GMBH–Siegen, 965 F.2d 994, 998-99 (11th Cir. 1992). The "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." Priester v. City of Riviera Beach, 208 F.3d 919, 925 n. 3 (11th Cir. 2000).

Manages the overall function of the finance department. Prepares monthly financial statements. Oversees the investments of all city funds. Negotiates with banks to obtain best banking and financial packages for the city. Develops policies and procedures for all collections and dispersal of money. Works with auditors performing the city audit. Ensures all cash receipts are deposited. Ensures there are sufficient funds and working capital to operate the city. Ensures all related records are maintained. Monitors all funds received or expended by the city. Maintains the general ledger of the city, monitoring daily updates of credits and debits to various city accounts. Prepares city budget and assists department heads in preparing department budgets. Oversees investment bid documents on certificate of deposits and other investment instruments. Supervises the receipt of municipal revenue, maintains receipt and revenue records. Prepares reports on city revenues and estimated revenues as needed. Prepares schedules on user fees and other revenue sources as needed for budgeting purposes. Reviews reconciliation of various accounts. Prepares records, reports and fiscal summaries as requested. Prepares account reconciliation billing for all city projects. Oversees the maintenance of cash management/investment schedule. Upon request, provides daily revenue analysis reports and treasury reports to the Mayor.

(Doc. 20-9 (Treasurer Job Description)).

In 2016, George Evans (Evans) served as Mayor of the City of Selma and was running for reelection. Defendant Dario Melton (Melton) was running against Evans. (Doc. 20-3 at 19 (Dep. Melton at 18)). Wade was Treasurer for the City.

In July 2016, Wade had an interaction with Melton at a restaurant. (Doc. 20-1 at 12-15 (Dep. Wade at 11-14)).[3] During this interaction, Melton asked Wade questions about the City's finances. (Id.). Wade responded "George Evans is my boss now. He's the current mayor…should you win, I will meet with you and discuss that…but I don't want to get involved in politics. I want to stay away from that. I just want to do my job." (Id. at 15 (Dep. Wade at 14)).

According to Wade, she "saw a complete change in Mr. Melton's facial expression toward me when I mentioned the name of his primary opponent, namely incumbent Mayor George

---

[3] Before seeing Melton at the restaurant, Melton's cousin-in-law, Terry Chestnut, asked Wade to meet with Melton. (Doc. 20-1 at 13 (Dep. Wade at 12)). Wade told Terry Chestnut that she did not want to meet with Melton. However, Terry Chestnut brought Melton to the restaurant where Wade was having lunch with a friend. (Id. at 12-13 (Dep. Wade at 11-12)).

Evans." (Doc. 20-2 at 4 (Decl. Wade at 4)). Wade surmises that Melton thought she was an Evans supporter. (Id.). Melton acknowledged asking Wade about the City's budget and the state of the City's finances before he was elected Mayor. (Doc. 20-3 (Dep. Melton at 17)). There is no evidence of any further interaction between Melton and Wade before the election.

Melton won the mayoral race and took office on November 10, 2016. (Doc. 20-3 at 23 (Dep. Melton at 22)). According to Wade, Melton took immediate actions against her. (Doc. 20-1 at 20 (Dep. Wade at 19)). Specifically, Melton prohibited Wade from working late by turning the alarm on and turning the lights off while Wade was still in her office. (Doc. 20-1 at 21 (Dep. Wade at 20)). Melton met with members of Wade's staff without her knowledge; Melton allowed Wade's staff to leave early without consulting her or telling her; and Wade's communication with her staff was frustrated because Melton told Wade's staff not to speak to her. (Doc. 20-1 at 20, 23-24 (Dep. Wade at 19, 22-23)). Additionally, "there was dissension…created between [Wade] and the department heads;" Wade was excluded from meetings, and isolated from the rest of the department heads. (Doc. 20-1 at 21-22 (Dep. Wade at 20-21)). Melton also required Wade get his permission before she performed tasks she previously did without permission; "a lot of things [she] normally would be able to do were cut off…" (Doc. 20-1 at 22 (Dep. Wade at 21)).

On February 4, 2017, Melton called Gerald Chestnut into his office. (Doc. 20-5 (Decl. Gerald Chestnut at 1)). Gerald Chestnut started working for the City two days earlier on February 2, 2017. (Id.). Gerald Chestnut recounts her conversation with Melton as follows:

> Mayor Darrio Melton called me into his office. He told me that he was going to fire Ronita Wade. I asked, who is Ronita Wade? He replied, the City Treasurer. To that I asked, "Mayor, why do you want to fire her?" Mayor Melton replied, "because I don't like her." To that I stated, Mayor, you cannot just fire people because you do NOT like them. And I asked, doesn't she report to the City Council? Additionally, I have heard that they (the Selma City Council) really like her and her work. Mayor Melton then stated that this is an At Will State and I can do whatever I like. To that I replied, Mayor, you need to the [sic] look up the definition to "At Will." That is

NOT what At Will means. You must have just cause. And if you fire her, the City Council will rehire her. To that Mayor Melton replied, every time they rehire her, I will fire her." I said Mayor, you have a lot to learn.

(Doc. 20-5 (Decl. Gerald Chestnut at 1)). Gerald Chestnut told Wade about her conversation with Melton. (Doc. 20-2 at 4 (Decl. Wade at 4)).

As Treasurer, Wade was responsible for preparing the City's budget. (Doc. 20-1 at 55 (Dep. Wade at 54); Doc. 20-9 (Treasurer Job Description)). Prior to submission of the September 2017 budget to the City Council, Melton stopped communicating with Wade. (Doc. 20-1 at 24 (Dep. Wade at 23)). Wade asked Melton if they were going to meet to discuss the budget, but Melton would not respond to Wade's communication or to her emails. (Doc. 20-1 at 25 (Dep. Wade at 24)). Melton "made himself unavailable to" Wade. (Doc. 20-1 at 27 (Dep. Wade at 26)). In the meantime, Melton was preparing his own budget; Wade did not know Melton was preparing his own budget because Melton did not communicate that to Wade. (Doc. 20-1 at 25 (Dep. Wade at 24)). Previously, Wade prepared the budget together with Mayor Evans. (Id.). Wade continued preparing the budget, incorporating the changes Melton told her to make before he stopped communicating with her. (Doc. 20-1 at 57 (Dep. Wade at 56)).

Wade informed the president of the Council before the September 2017 City Council meeting that Melton was not communicating with her regarding budget preparations. (Doc. 20-1 at 58 (Dep. Wade at 57)). The president told Wade to bring her version of the budget with her to the City Council meeting and see what Melton presented. (Id.). At the meeting, Melton presented a budget to the Council. (Id.). Thereafter, "[u]pon the request of a council person," Wade presented her version of the budget. (Id.). And see (Doc. 20-3 at 32 (Dep. Melton at 31) ("she presented the budget while I was presenting the budget")).

Later that same month, Toney Stephens (Stephens) attended a meeting with "several other leaders of city government…also present." (Doc. 20-10 at 1 (Aff. Toney Stephens at 1) (fire chief for the City from 2015-2019)). During this meeting, Melton expressed that he was unhappy with "Wade's different approach as the Treasurer of the City of Selma." (Doc. 20-10 at 1 (Aff. Toney Stephens at 1)). Melton told Stephens and others present at the meeting "that he needed someone who could 'get something on Ronita Wade,' and if they didn't have anything 'they could just make it up.'" (Doc. 20-10 at 1 (Aff. Toney Stephens at 1)).

On September 19, 2017, Melton placed Wade on involuntary administrative leave. (Doc. 20-1 at 64 (Dep. Wade at 63)). One week later, on September 26, 2017, Melton terminated Wade for "insubordination, lack of cooperation, and a repeated history of behavior unbecoming of a city employee…" (Doc. 20-11 at 1 (First Termination Letter)). Per Melton, Wade was terminated for "lying to a superior officer;" for telling "us the [budget] numbers were wrong a[n] hour before the budget hearing." (Doc. 20-3 at 32-33 (Dep. Melton at 31-32)).

Pursuant to Alabama Code Section 11-43-81, Melton could remove Wade "for good cause…temporarily" but Melton "must report such removal and his reasons therefor to the council at its next regular meeting, when, if the council shall sustain the act of removal by the mayor by a majority vote of those elected to the council…" (Doc. 20-7) (Ala. Code (1975) § 11-43-81)). After Melton terminated Wade, Wade immediately appealed her termination to the City Council. (Doc. 20-12 (First Request for Disciplinary Hearing)). On October 10, 2017, the City Council reinstated Wade as Treasurer. (Doc. 20-1 at 59 (Dep. Wade at 58); Doc. 20-2 at 1-2 (Decl. Wade at 1-2)).

Thereafter, the following events occurred:

- **October 12, 2017:** Melton placed Wade on administrative leave with pay. (Doc. 20-2 at 1-2 (Decl. Wade at 1-2)); (Doc. 15-10 (Administrative Leave letter)).

- **December 22, 2017:** Melton again terminated Wade. (Doc. 20-2 at 1-2 (Decl. Wade at 1-2); Doc. 20-13 (Second Termination Letter)).

- **January 18, 2018:** Wade requested a formal hearing regarding her termination to the Selma City Council. (Doc. 21 at 10).

- **February 13, 2018:** Selma City Council reinstated Wade as Treasurer. (Doc. 20-2 at 1-2 (Decl. Wade at 1-2)).

After being reinstated a second time, Wade states without specifics that Melton "once again began frustrating her abilities and duties as City Treasurer." (Doc. 21 at 10).

Wade was again placed on administrative leave on September 26, 2018 because "Ms. Wade was 'under investigation.'" (Doc. 20-2 at 2, 3 (Decl. Wade at 2, 3)). Wade states Melton has claimed Wade was under investigation since 2017. (Doc. 20-2 at 2, 3 (Decl. Wade at 2, 3)). On November 13, 2018, Wade appeared in front of the City Council for the third time in 13 months. This time, "the City Council deferred voting and assigned the matter to an insurance attorney for further consideration." (Doc. 20-2 at 2 (Decl. Wade at 2)).

One week later, on November 20, 2018, Wade filed a declaratory action against Melton in the Circuit Court of Dallas County, Alabama. (Doc. 20-14). On May 9, 2019, the state court preliminarily enjoined Melton and reinstated Wade to her position as Treasurer. (Doc. 20-16). The state court made its May order final on July 16, 2019. (Doc. 20-17). Since the state court entered its final order, Wade asserts that:

> Melton kept interfering with my ability to do my job. Mayor Melton still restricted my access to the software systems and VPN, which badly interfered with my ability to do my job. Mr. Melton also interfered with the directions I gave my staff, as approved by the City Council. Mr. Melton would also tie up my staff with extended meetings in his office, so that I frequently didn't know where they were. Thus, when I needed them, thanks to the mayor, the staff was unavailable to help. Further, the mayor interfered with my accountant, Ms. Notozko Pamacheche, taking her away from me without notice. It also took me many months to get my cell phone and computer back, both of which were necessary to do my job. Also, Mr. Melton went out of his way to create enmity between me and other department heads by

> misrepresenting what I was doing. The Mayor was constantly 'stirring the pot' against me.

(Doc. 20-2 at 3 (Decl. Wade at 3)). As a result, Wade maintains she returned to the Dallas County Circuit Court on March 31, 2020 seeking sanctions against Melton. (Doc. 20-18); (Doc. 20-2 at 4 (Decl. Wade at 4)).

Wade filed this action September 9, 2019. (Doc. 1). Wade asserts three federal claims against Defendants pursuant to 42 U.S.C. § 1983 for: 1) Violation of First Amendment Right to Freedom of Speech; 2) Violation of First Amendment Right to Freedom of Political Association; and 3) Violation of Fourteenth Amendment Right to Procedural and Substantive Due Process. (Doc. 5). Wade also asserts a state law claim for Tortious Interference. (Id.).

## II.     Standard of review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Defendants, as the parties seeking summary judgment, bear the initial responsibility of informing the district court of the basis for their motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). If the nonmoving party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof—that a genuine dispute of material fact exists—the moving party is entitled to summary judgment. Celotex, 477 U.S. at 323. "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter…the evidence of the non-movant is to be believed, and all justifiable inferences are to be

drawn in his favor." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998–99 (11th Cir. 1992) (internal citations and quotations omitted).

## III.  Analysis

### A.  Qualified immunity

#### 1. Official capacity claims

Wade asserts each of her four claims against Melton in both his individual and official capacities. (Doc. 5 at 6-12). Official capacity claims against an individual defendant are unnecessary when the defendant's employer is a named defendant. See Kentucky v. Graham, 473 U.S. 159, 166 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."); Snow ex rel. Snow v. City of Citronelle, Ala., 420 F.3d 1262, 1270 (11th Cir. 2005) (affirming summary judgment on official capacity claims against police officers when their employer was also a defendant). The City of Selma, Melton's employer, is also a named defendant. (Doc. 5). Thus, Wade's claims against Melton in his official capacity are duplicative.

#### 2. Individual capacity claims

"Qualified immunity allows government employees to carry out their discretionary duties without fear of litigation, 'protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law.' " Mercado v. City of Orlando, 407 F.3d 1152, 1156 (11th Cir. 2005) (citation omitted); and see Vineyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002) (citing Harlow v. Fitzgerald, 457 U.S. 800, 812 (1982)) (same).

To qualify for the protection of the doctrine, a public official must first prove that he was acting within the scope of his discretionary authority at the time the alleged wrongful acts occurred. Terrell v. Smith, 668 F.3d 1244, 1250 (11th Cir. 2012). "It is the burden of the governmental

official to make this showing." Holloman ex rel. Holloman v. Harland, 360 F.3d 1252, 1264 (11th Cir. 2004) (citing Storck v. City of Coral Springs, 354 F.3d 1307, 1314 (11th Cir. 2003)). "If the defendant was not acting within his discretionary authority, he is ineligible for the benefit of qualified immunity." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002).

To determine whether a public official acts within his "discretionary authority," he must show "objective circumstances that would compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority." Rich v. Dollar, 841 F.2d 1558, 1564 (11th Cir. 1988) (quoting Barker v. Norman, 651 F.2d 1107, 1121 (5th Cir. 1981)). "Discretionary authority includes the job-related powers and responsibilities that the public official has in the general fulfillment of his official duties." Blackshear v. City of Miami Beach, 799 F. Supp. 2d 1338, 1344 (S.D. Fla. 2011) (citing O'Rourke v. Hayes, 378 F.3d 1201, 1205 (11th Cir. 2004)). Here, the Court in its analysis should look to whether Melton was acting within his discretionary authority when he terminated Wade. See e.g., Webster v. Altenkirch, 2020 WL 5819678, *6 (N.D. Ala. Sept. 30, 2020) (discussing the defendants' authority, within their discretion, to terminate the plaintiff's employment). "However, this issue of discretionary authority should not be conflated with the second issue of whether a violation of a clearly established constitutional right took place because '[a] defendant is not failing to act within his discretion merely because he or she is doing something unlawful.'" Webster v. Altenkirch, 2020 WL 5819678 at *6 (citing Godby v. Montgomery Cty. Bd. of Educ., 996 F. Supp. 1390, 1401 (M.D. Ala. 1998)).

Here, pursuant to Alabama Code Section 11-43-81, Melton was authorized to remove Wade. (Doc. 20-7 (Ala. Code (1975) § 11-43-81)). Thereafter, because the position of Treasurer is an appointed position, the City Council may choose to reinstate the Treasurer notwithstanding the

mayor's temporary removal. (Doc. 20-6). But, Melton's decisions to remove Wade, which were subject to City Council review, were within his discretionary authority. Wade does not respond to Defendants assertion that these decisions were within Melton's discretionary authority.

If the defendant shows he was acting within his discretionary authority, the burden then shifts to the plaintiff to show that qualified immunity does not apply. Terrell, 668 F.3d at 1250. "[T]he plaintiff must make two showings...First, she 'must establish that the defendant violated a constitutional right.'...Second, she must show the violated right was 'clearly established.' " Corbitt v. Vickers, 929 F.3d 1304, 1311 (11th Cir. 2019) (internal citations omitted). And see Pearson v. Callahan, 555 U.S. 223, 232 (2009).[4] "'The relevant, dispositive inquiry' for determining clearly established law is whether a reasonable government employee's conduct was clearly unlawful in the situation confronted. Boyce v. Andrew, 510 F.3d 1333, 1341 (11th Cir. 2007) (citing Saucier v. Katz., 533 U.S. 194, 201 (2001)). "[T]he *threshold inquiry* for deciding if qualified immunity is appropriate is *determining under First Amendment, government-speech law whether there has been a constitutional violation by the government employer.*" Boyce, 510 F.3d at 1341 (quoting Travers v. Jones, 323 F.3d 1294, 1295 (11th Cir. 2003) (per curiam)) (emphasis in original). For the reasons discussed *infra*, Wade has not shown a constitutional violation of her First Amendment right to Freedom of Speech or her Due Process Rights. So, the Court does not address Defendants' assertion of qualified immunity as to those claims. And, as discussed *supra*, the Court does not address qualified immunity as to Wade's First Amendment Political Association claim because an issue of fact exists as to whether a constitutional violation occurred.

**B.    Count I: First Amendment Freedom of Speech Claim**

---

[4] Federal courts have discretion in deciding which prong to address first. See Pearson, 555 U.S. at 236.

Wade alleges that after Melton became mayor, he "took numerous and continuous adverse employment actions against [Wade]…in retaliation for her refusal to speak with and provide Melton with the City's financial information while a candidate." (Doc. 21 at 15 (citing Doc. 20-2 at 4 (Decl. Wade at 4)). According to Wade, Melton's "repeated unlawful acts and attempts to terminate her after he was elected mayor, violated her right to be free from retaliation, as is established by the First Amendment..." (Id. at 15). Defendants respond that Wade "has not identified any actual speech she claims are protected under the First Amendment." (Doc. 16) (emphasis in original). Per Defendants, even still, Wade cannot show any First Amendment protected expression here because no expression was made as a citizen on a behalf of the public. (Doc. 16).

"To establish a First Amendment retaliation claim, a plaintiff must show that (1) her speech was constitutionally protected; (2) she suffered adverse conduct likely to deter a person of ordinary firmness from engaging in such speech; and (3) there was a causal relationship between the adverse conduct and the protected speech." Castle v. Appalachian Tech. Coll., 631 F.3d 1194, 1197 (11th Cir. 2011).

The First Amendment protects "both the right to speak freely and the right to refrain from speaking at all." Wooley v. Maynard, 430 U.S. 705, 714 (1977). Public employees are not stripped of those rights after accepting a job with the government. Lane v. Franks, 573 U.S. 228, 236 (2014). Public employee's speech is protected if it first crosses a constitutional threshold: the speech must be 'as a citizen on a matter of public concern.' Garcetti v. Ceballos, 547 U.S. 410, 418 (2006) (citing Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cty., Ill., 391 U.S. 563, 568 (1968)). If not, "the employee has no First Amendment cause of action based on his or her

employer's reaction to the speech" and the claim simply fails. Garcetti, 547 U.S. at 418 (citing Connick v. Myers, 461 U.S. 138, 147 (1983)).

First, the Court must determine 'whether the speech at issue was made primarily in the employee's role as citizen, or primarily in the role of employee.'" Boyce, 510 F.3d at 1341-42 (quoting Kurtz v. Vickrey, 855 F.2d 723, 727 (11th Cir. 1988)).

The Supreme Court in Garcetti v. Ceballos, 547 U.S. 410 (2006) explained that the line between speaking as a citizen or as a public employee turns on whether the speech "owes its existence to a public employee's professional responsibilities." 547 U.S. at 421–22; see also Boyce, 510 F.3d at 1342–43 (collecting cases "[f]ollowing Garcetti" in which the Eleventh Circuit interpreted the phrase "owes its existence to"). In Lane v. Franks, 573 U.S. 228 (2014) the Supreme Court clarified what it meant in Garcetti when it used the phrase "owes its existence to":

> [T]he mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech. The critical question under Garcetti is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties.

Lane, 573 U.S. at 240.

The Eleventh Circuit thereafter "explained that '[a]fter Lane,' Garcetti's phrase 'owes its existence to ... must be read narrowly to encompass speech that an employee made in accordance with or in furtherance of the ordinary responsibilities of her employment, not merely speech that concerns the ordinary responsibilities of her employment.'" Carollo v. Boria, 833 F.3d 1322, 1329 (11th Cir. 2016) (citing Alves v. Board of Regents of the University System of Georgia, 804 F.3d 1149, 1162 (11th Cir. 2015)). Moreover, "[p]ractical factors that may be relevant to, but are *not* dispositive of, the inquiry include the employee's job description, whether the speech occurred at the workplace, and whether the speech concerned the subject matter of the employee's job." Alves,

804 F.3d at 1161 (emphasis in original) (citations omitted). And see Garcetti, 547 U.S. at 424-25 ("The proper inquiry is a practical one" wherein "[f]ormal job descriptions often bear little resemblance to the duties an employee actually is expected to perform.").

Wade narrowly classifies her refusal to speak as citizen speech asserting Melton "insist[ed] that she publicly divulge certain information and opinions she had about the City's finances." (Doc. 21 at 16); and see Doc. 20-2 at 4 (Decl. Wade at 4)). Moreover, Wade asserts her "decision not to provide Melton with information about the City's finances, while Melton was a candidate, was not made in her official capacity, as this was not part of her professional duties as City Treasurer." (Doc. 21 at 18).

Defendants characterize Wade's refusal to speak generally as employee speech, reasoning "any statements…were made as part of her professional duties as City Treasurer—and specifically responses to inquiries into the details of the City's finances." (Doc. 16 at 10). The Court agrees. Melton requested information about the City's finances; he spoke to Wade because she was the City's Treasurer. It is part of Wade's duties to prepare financial statements and reports for the City and to generally be involved in the receipt and investment of City funds.  It is also part of Wade's duty to prepare finance reports for the Mayor, when requested. If Wade had given Melton the requested information, she would have spoken in her capacity as the City Treasurer.  See Phillips v. City of Dawsonville, 499 F.3d 1239, 1242–43 (11th Cir. 2007) ("Plaintiff's appointed position as City Clerk gave her some control over and accountability for City funds …. We conclude that the reporting here of the improper use of city resources and of behavior that might well result in expense and even liability for the City was speech pursuant to Plaintiff's official duties. She is, therefore, entitled to no First Amendment protection for this speech.")

Wade refused to speak with Melton about the City's finances, because she was currently working under the administration of Mayor Evans and she "just want[ed] to do [her] job." (Doc. 20-1 at 52 (Dep. Wade at 51)). In other words, Wade did not give the information to Melton because she felt it was inappropriate as the City Treasurer to discuss City finances with Mayor Evans' opponent, and she did not feel that it was her job to give the financial information about the City to Melton. Accordingly, as a matter of law, Wade was speaking as a public employee when she refused to provide financial information about the City to Melton. Wade's speech is not protected by the First Amendment.

**C.      Count II: First Amendment Freedom of Political Association**

Wade argues "Defendant Melton retaliated against her because she did not support and assist Defendant Melton during his campaign." (Doc. 21 at 24). "The First Amendment protects political association as well as political expression." Elrod v. Burns, 427 US 347, 357-58 (1976) (citing Buckley v. Valeo, 424 U.S. 1, 11 (1976)). "The right to eschew association for expressive purposes is likewise protected." Janus v. American Federation of State, County and Mun. Employees, Council 31, 138 S.Ct. 2448, 2463 (2018) (citing Roberts v. United States Jaycees, 468 U.S. 609, 623 (1984) ("Freedom of association…plainly presupposes a freedom not to associate"); see Pacific Gas & Elec. Co. v. Public Utilities Com'n of California, 475 U.S. 1, 12 (1986) ("[F]orced associations that burden protected speech are impermissible")).

As the Eleventh Circuit explained in Rodriguez v. City of Doral:

> To prevail on a First Amendment political-association claim, a plaintiff must show that (1) [s]he engaged in constitutionally protected political affiliation or held constitutionally protected political beliefs, and (2) [her] protected conduct was a "substantial or motivating factor" in the decision to take adverse action against the plaintiff. *Holley v. Seminole Cty. Sch. Dist.*, 755 F.2d 1492, 1500 (11th Cir. 1985) (citing *Mt. Healthy City Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). If the plaintiff meets these requirements, the burden shifts to the employer, who must demonstrate by a preponderance of the evidence that it

would have made the same employment decision, even had the plaintiff never engaged in the protected conduct. *Id.* (citing *Mt. Healthy*, 429 U.S. at 287, 97 S.Ct. 568; *Paschal v. Fla. Pub. Emp't Relations Comm'n*, 666 F.2d 1381, 1384 (11th Cir.), *cert. denied*, 457 U.S. 1109, 102 S.Ct. 2911, 73 L.Ed.2d 1319 (1982)).

863 F.3d 1343, 1350 (11th Cir. 2017).

The threshold question—whether the First Amendment protects the plaintiff's conduct—is a question of law for the court to decide. Hatcher v. Board of Public Educ. And Orphanage for Bibb County, 809 F.2d 1546, 1556 (11th Cir. 1987) (citing Holley, 755 F.2d at 1500–01 and Sykes v. McDowell, 786 F.2d 1098, 1103 (11th Cir. 1986)). "[T]he other elements are questions of fact," which are usually more appropriately left to the jury to resolve, except, of course, when no genuine issue of material fact exists. Id.

First, Wade asserts she had a First Amendment right to choose not to associate with any mayoral candidate and to avoid the politics of the mayoral race altogether. (Doc. 21 at 23). Wade also states "she…firmly asserted to Defendant Melton how George Evans, the current mayor, was her present boss; how she did not want to get involved in politics or the mayor's race; and how she just wanted to do her job." (Id.). Thereafter, according to Wade, "Defendant Melton began treating Ms. Wade as if she was supporting Mayor Evans" and she witnessed "a complete change in Defendant Melton's expression when she mentioned his opponent." (Id. (citing Doc. 20-2 at 4 (Decl. Wade at 4)). Defendants seem to argue that a right to remain neutral does not exist, summarily stating, "Plaintiff fails to allege the type of association protected by the First Amendment." (Doc. 16 at 13).

Both the right to associate and the right not to associate (remain neutral) are protected by the First Amendment. Janus, 138 S.Ct. at 2463. And, as Defendants recognize, the Eleventh Circuit has an expansive view of First Amendment associational claims which would protect Wade's association with her boss at the time, George Evans. See Jones v. Ward, 514 Fed.Appx. 843, 847-

48 (11th Cir. 2013) (finding the First Amendment protected the plaintiffs association with her former boss who was later defeated in an election). And see Jones v. Hamic, 875 F.Supp.2d 1334, 1358 (M.D. Ala. 2012) aff'd Jones v. Ward, 514 Fed.Appx. 843, 847-48 (11th Cir. 2013) ("The Eleventh Circuit has gone a step further, however, finding that First Amendment associational claims need not deal with political or public matters; rather, purely private concerns are protected, too."). Wade has a constitutionally protected right not to be retaliated against for choosing to remain neutral or choosing to associate with Evans.

Still, Wade must show this protected conduct was a "substantial or motivating factor" in the adverse action taken against her. Rodriguez, 863 F.3d at 1350. The plaintiff's burden "is not a heavy one," and there is no "single standard" for determining whether a plaintiff's protected activity was a substantial or motivating factor in the employment decision. Stanley v. City of Dalton, 219 F.3d 1280, 1291 (11th Cir. 2000) (internal quotation marks omitted). Courts consider the record as a whole, including:

> (1) the temporal proximity between the termination and the protected activity; (2) whether any reasons for the termination were pretextual; (3) whether any comments made, or actions taken, by the employer indicate the discharge was related to the protected[activity]; (4) whether the asserted reason for the discharge varied; and (5) any circumstantial evidence of causation, including such facts as who initiated any internal investigations or termination proceedings, whether there is evidence of management hostility to the [activity] in question, or whether the employer had a motive to retaliate.

Kamensky v. Dean, 148 F. App'x 878, 881 (11th Cir. 2005) (citing Stanley v. City of Dalton, Ga., 219 F.3d 1280, 1291 n. 20 (11th Cir. 2000)).[5]

---

[5] The Court in Stanley noted these factors were used to determine if an inference could be made that the adverse action occurred because of the protected activity. 219 F.3d 1280, 1291, n. 20. These factors are considered in First Amendment retaliation cases for both speech and associational claims. See e.g., Kamensky v. Dean, 148 Fed.Appx. 878, 881 (first amendment speech case); Lock v. City of West Melbourne, Fla., 2015 WL 1880732, *15 (M.D. Fla. April 24, 2015) (using these cases in a political affiliation case).

Defendants contend: 1) the time between when the alleged protected activity occurred and when Wade was terminated the first time fails to support a causal connection based on temporal proximity; 2) Wade has not presented evidence that "Melton attempted to terminate her *because of* her past association with any candidate"; and 3) Wade's evidence of retaliation does not amount to an adverse action. (Doc. 16 at 12-14).

As to temporal proximity, Defendants specifically rely on the 10-month gap between when Melton began his first term as mayor in November 10, 2016 and Wade's first termination in September 2017. (Doc. 16 at 13); (Doc. 20-3 at 23 (Dep. Melton at 22)).[6] A lapse in time, standing alone, does not preclude the existence of a genuine issue of material fact as to causation. Stanley, 219 F.3d at 1291 ("[W]e have stated that 'gaps of time, standing alone, do not preclude [a plaintiff] from producing enough evidence for a reasonable jury to conclude that protected speech was a substantial factor in the decision to terminate [her].""). See Beckwith v. City of Daytona Beach Shores, Fla., 58 F.3d 1554, 1566 (11th Cir. 1995) (noting that a reasonable jury could infer that the defendants "used a relatively slow and deliberate process," lasting over one year, to terminate the plaintiff); Schneider v. Indian River Cmty. Coll. Found., Inc., 875 F.2d 1537, 1543 n.9 (11th Cir. 1989) (holding that lapse of 10 months did not preclude the existence of a genuine issue of material fact).

Wade outlines a series of events that occurred before and between each of her terminations. (Doc. 21 at 27).[7] Per Wade, Melton took immediate actions against her after assuming office. (Doc.

---

[6] The conversation where the alleged protected activity occurred happened in July 2016, so the time gap is 15 months. (Doc. 21 at 2). But because Melton was not mayor until November, he was not in a position to adversely act toward Wade until November 2016.

[7] Defendants contend "the additional facts cited by Plaintiff as 'evidence' of retaliation outside of termination, fall short of an adverse employment action and are therefore not actionable as 'retaliation.'" (Doc. 16 at 14). However, the allegations are relevant to the issue of causation. See Kamensky v. Dean,

20-1 at 20 (Dep. Wade at 19)). Wade testified that Melton "prohibited [her] from working late. Turning the alarm on. Cutting the lights off while [Wade] was in [her] office." (Doc. 20-1 at 20-21 (Dep. Wade at 19-20)). Moreover, Wade generally contends that she "was excluded from meetings, isolated from the rest of the department heads." (Id. at 21-22 (Dep. Wade at 20-21)). Wade does not specify when each of these events occurred or the context. And the Court agrees that these are not actionable adverse actions. However, the continuing nature of the alleged animosity toward Wade may be evidence of causation.

Additionally, Wade submits evidence of the following dated events:

- **February 4, 2017:** Melton told Ms. Gerald Chestnut "that he was going to fire Ronita Wade" because he "[doesn't] like her." (Doc. 20-5 at 1 (Decl. Gerald Chestnut at 1)). Ms. Chestnut then told Melton that "if you fire her[, Wade,] the City Council will rehire her" to which Melton retorted, "every time they rehire her, I will fire her." (Id. (Decl. Chestnut at 1)). Ms. Chestnut told Wade about this conversation with Melton. (Doc. 20-2 at 4 (Decl. Wade at 4)).

- **September 2017:** Toney Stephens (fire chief for the City of Selma from 2015-2019) recounted that at a meeting in September 2017 Melton told Stephens and others present that he [Melton] needed someone who could 'get something on Ronita Wade' and if they didn't have anything 'they could just make it up.'" (Doc. 20-10 at 1 (Aff. Stephens at 1)).

- **September 19, 2017:** Melton placed Wade on involuntary administrative leave. (Doc. 21 at 9); (Doc. 20-2 at 1 (Decl. Wade at 1)).

- **September 27, 2017:** Melton terminated Wade. (Doc. 20-11 (First Letter of Termination).

- **October 2, 2017:** Wade requested a formal hearing regarding her termination to the Selma City Council. (Doc. 20-12 (First Request for Disciplinary Hearing)).

- **October 10, 2017:** Selma City Council reinstated Wade as Treasurer. (Doc. 20-2 at 1-2 (Decl. Wade at 1-2)).[8]

---

148 F. App'x 878, 881 (11th Cir. 2005) (explaining the court looks to the record as a whole including any circumstantial evidence of causation).

[8] There were minimal gaps between the remaining terminations, as outlined *supra,* Section I Factual Background.

Thus, Melton told Ms. Gerald Chestnut he did not like Wade seven months after Wade's alleged protected associational activity and three months after Melton assumed office.

Second, Defendants argue Wade has not presented evidence that Melton placed her on administrative leave or terminated her *because of* her political association or political neutrality. (Doc. 16 at 13). To this point, Wade reiterates the evidence discussed *supra* as support for her claim. (Doc. 21 at 27). Though not in response to Defendants causation argument, Wade's recitation of the facts asserts that, in July 2016, Melton's demeanor toward her changed when she refused to speak about the City's finances and "when she mentioned his opponent" during that same conversation. (Doc. 21 at 3, 7). Wade also presented evidence that Melton told City employees in February 2017 that he wanted to fire Wade because he did not like her. (Doc. 20-5 at 1 (Decl. Gerald Chestnut at 1); Doc. 20-10 (Decl. Stephens)). These statements evince an intent to take action against Wade. Whether the intent to take adverse action was based on Wade's political neutrality or support of the former mayor, or because of Wade's unsupportive attitude toward Melton after he took office, or because Melton simply didn't like Wade is a question for the jury. Compare Schneider, 875 F.2d at 1543 (President's statements that he wanted to "get rid" of plaintiff if plaintiff did not stop the protected speech (communication with a representative) created a genuine issue of fact as to causation); and Fikes v. City of Daphne, 79 F.3d 1079, 1084–85 (11th Cir. 1996) (Police chief's statement that he wanted the plaintiff out of the police department after he learned of plaintiff's protected speech (reports of internal wrongdoing), was relevant evidence of causation in combination with other causal evidence).

The next inquiry is whether the law was clearly established. In Rutan v. Republican Party of Illinois, the Court held that "[u]nder our sustained precedent, conditioning hiring [and firing] decisions on political belief and association plainly constitutes an unconstitutional condition,

unless the government has a vital interest in doing so." 497 U.S. 62, 78 (1990). There is no suggestion that political beliefs or association is an essential part of Wade's job. Thus, the law as applied to the facts of this case, that Melton cannot fire Wade because of her political neutrality (or association with the former mayor), was firmly established. Thus, because there is an issue of fact regarding whether the constitutional violation occurred, Melton cannot prevail on qualified immunity at this stage of the litigation.

**D.**     <u>**Count III: Fourteenth Amendment Due Process**</u>

Wade alleges Melton "repeatedly and unlawfully" placed Wade on administrative leave and terminated her. (Doc. 21 at 29). She also asserts that after Melton terminated her a third time, the City Council refused to vote and "[b]y failing to vote, the City essentially failed to provide adequate procedural due process established by Alabama law." (<u>Id.</u>). According to Wade, she was left to seek declaratory relief in state court because the City did not vote after Wade was terminated a third time, and this violated her due process rights. (<u>Id.</u>). Moreover, Wade asserts the relief available in state court did not remedy Wade's procedural due process violations. (<u>Id.</u> at 30).

Defendants contend that Wade "has not alleged in her amended complaint or shown that Alabama law provided her an inadequate post-deprivation remedy." (Doc. 16 at 16). And, per Defendants, Wade "was provided full due process by the City's policies" after each termination and Wade took advantage of those processes after each termination. (<u>Id.</u>). Moreover, though the City Council declined to vote on reinstatement after Wade's third termination, Defendants assert Wade "sought and received redress in the state court system." (<u>Id.</u>). Defendants maintain that the availability of damages in state court, though different than in federal court, does not render Wade's state court remedy inadequate. (Doc. 22 at 11). Defendants also assert that Wade "appears

to admit there was no due process violation associated with her first two removals from office;" thus Wade's procedural due process claim is with respect to her third termination only. (Id.).

The Eleventh Circuit explained in LaFleur v. Hugine,

> When analyzing a claim of procedural due process, we address two questions: (1) whether the plaintiff had a property interest of which she was deprived by state action; and (2) if so, whether she received sufficient process concerning that deprivation. *See Ross v. Clayton Cnty., Ga.,* 173 F.3d 1305, 1307 (11th Cir. 1999). "A public employee has a property interest in employment if existing rules or understandings that stem from an independent source such as state law create a legitimate claim of entitlement," and this determination "requires examination of relevant state law." *Id.* (citations and internal quotation marks omitted). An interest in continued employment may be created if a "state law or local ordinance in any way limits the power of the appointing body to dismiss an employee." *Id.* (citation and internal quotation marks omitted).

587 Fed.Appx. 536, 541 (11th Cir. 2014).

"A public employee who may be terminated only for cause…has a protected property interest in continued employment." Caruana v. Columbia County Bd. of Educ., 493 Fed.Appx. 34, 37 (11th Cir. 2012) (quoting Warren v. Crawford, 927 F.2d 559, 562 (11th Cir. 1991)). "For purposes of establishing a property right in continued employment under Alabama law, the crucial question is whether the employment is terminable by the employer 'at will' or whether the employer's discretion to discharge the employee is somehow fettered." Forsyth, 2018 WL 1035126 at *6 (citing Green v. City of Hamilton, Hous. Auth., 937 F.2d 1561, 1564 (11th Cir. 1991)). And see Amador v. Town of Palm Beach, 517 Fed.Appx. 834, 838 (11th Cir. 2013) (citing Warren v. Crawford, 927 F.2d 559, 562-64 (11th Cir. 1991)) ("the employee does not have a constitutionally protected property interest where the terms of employment give the public employer significant discretion to terminate an employee.").

Wade's position as Treasurer of the City of Selma was statutorily created. (Doc. 20-6). Section 11-43-3 describes that the City Council shall elect a treasurer. (Id.). Thereafter, the mayor

of the city may "remove any officer for good cause…temporarily, if such officer was elected by the council or appointed with its consent." (Doc. 20-7 (Ala. Code (1975) § 11-43-81)). If the mayor removes the treasurer temporarily, "he must report such removal and his reasons therefor to the council at its next regular meeting, when, if the council shall sustain the act of removal by the mayor by a majority vote of those elected to the council…" (Id.). Moreover, "[a]ny person appointed to office in any city or town, may, for cause, after a hearing, be removed by the officer making the appointment." Ala. Code. § 11-43-60. Thus, Wade has a protected property interest.[9]

Next, in determining whether the process provided to a plaintiff was constitutionally adequate, courts examine the procedural safeguards built into the statutory procedure effecting the deprivation and any remedies for erroneous deprivations provided by statute or tort law. Zinermon v. Burch, 494 U.S. 113, 126 (1990). Where the property interest is one of continued employment, the employee is entitled to "some kind of a hearing" prior to termination. Cleveland v. Bd. of Educ. v. Loudermill, 470 U.S. 532, 542 (1985) (citation omitted). This includes oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story. Id. at 546. The hearing should serve as "an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." Id. at 545–46. Thus, it

---

[9] The Alabama Attorney General has interpreted the language of Alabama Code, § 11–43–3 to mean that "the term of office for the…city treasurer is four years" and, "these positions generally serve until the next general election and until their successors are elected and qualified." See Ala. Op. Atty. Gen. No. 2013–020, 2013 WL 226995, at *3 (Jan. 9, 2013) (citing Ala. Code § 11–43–3); and see Allred v. City of Carbon Hill, Ala., 2014 WL 5426822, *4 (N.D. Ala. 2014) (relying on Ala. Op. Atty. Gen. No. 2013-020 to find a neighboring Alabama Code section did not grant the plaintiff an interest in employment (or reappointment) that extended beyond the election of a new mayor). The Alabama Attorney General opinion also states the term of office ends generally by operation of law when a newly elected council takes office. 2013 WL 226995. The Council term is 4 years. Ala. Code §11-43C-7. So, the treasurer "must be reappointed at the beginning of each organizational meeting of a new council or as soon as practicable thereafter." 2013 WL 226995. Wade doesn't say she was reappointed when Melton took office, but she continued as Treasurer so the Court assumes she was.

need not be a full evidentiary hearing, nor does it need to definitively resolve the propriety of the discharge. Id.

Prior to Wade's first removal, Wade received a Notification of Pre-Determination Hearing which informed Wade of the charges against her—namely "insubordination or lack of cooperation." (Doc. 15-8 at 1-4). Wade was present at the pre-determination hearing. (Id. at 3). Thereafter, on September 27, 2017, Wade received a letter from Melton terminating her employment listing "insubordination, lack of cooperation and a repeated history of behavior unbecoming of a city employee" as reason for termination. (Doc. 20-11 (First Termination letter)).[10] On October 2, 2017, Wade requested a disciplinary hearing in front of the City Council after which the City Council reinstated Wade to her position as Treasurer. (Doc. 20-12 (First Request for Disciplinary Hearing); Doc. 20-2 at 1 (Decl. Wade at 1)). The process Wade received with respect to her first termination was constitutionally adequate.

As to Wade's second termination, she similarly received a letter notifying her of the reasons for being placed on administrative leave, followed by a letter explaining the reasons for termination. (Docs. 15-10 (Second Administrative Leave Notice); Doc. 20-13 (Second Termination Letter)). Wade appealed her termination to the City Council; the City Council again reinstated Wade. (Doc. 20-1 at 63 (Dep. Wade at 62)). Even though Melton's letters to Wade stated Wade was "terminated," Melton only had the authority to temporarily terminate Wade. (Doc. 20-7 (Ala. Code (1975) § 11-43-81)). Wade's second "termination" was subject to a vote by the City Council and only upon a majority vote by the City Council would Melton's temporary termination become final. (Id.). Even if Melton's actions constituted termination, a full evidentiary hearing

---

[10] Melton was authorized to temporarily remove Wade, subject to City Council review, so his notice of "termination" was not final until and unless the City Council voted to affirm his decision. See Doc. 20-7 (Section 11-43-81)).

within a reasonable time after termination will ensure that an employee's rights to procedural due process are protected. Loudermill, 470 U.S. at 546-47. See Harrison v. Wille, 132 F.3d 679, 684 (11th Cir. 1998) (finding that employer's provision of a full post-termination proceeding added support to a conclusion that the employee was afforded sufficient process); Hunt v. City of Mulberry, 173 F.Supp.2d 1288, 1292–93 (M.D. Fla. 2001) (holding that the plaintiff was afforded sufficient process when he was notified of the charges and evidence against him, given an opportunity to respond, and offered a post-termination hearing in which he presented evidence to a three-member panel). The City Council's review of her termination, which ended in Wade's reinstatement, ensured Wade's procedural rights were protected. As with Wade's first termination, Wade was afforded an adequate procedure with respect to her second termination.

Last, Wade asserts in her response that she was denied adequate procedural due process after her third termination when the City Council failed to vote regarding her reinstatement. (Doc. 21 at 29). Wade does not allege in her complaint that her procedural due process rights were violated by the City Council's actions generally; Wade does not assert the City's refusal to vote after Wade's third termination violated her due process rights. (Doc. 5 at 9). "A plaintiff may not amend her complaint through argument in a brief opposing summary judgment." Gilmour v. Gates, McDonald and Co., 382 F.3d 1312, 1315 (11th Cir. 2004 (citing Shanahan v. City of Chicago, 82 F.3d 776, 781 (7th Cir. 1996)). And see Dukes v. Deaton, 852 F.3d 1035, 1046 (11th Cir. 2017) (relying on Gilmour to find that plaintiff's attempt to assert an additional theory of supervisory liability in her brief on summary judgment was an improper attempt to amend her complaint).

Even assuming *arguendo*, Wade did allege the process Wade received from the City Council was inadequate from a timeliness standpoint or because it was not meaningful because Melton repeatedly contravened the City Council's reinstatements, Wade's Section 1983 due

process claim is nevertheless incognizable. A constitutional violation is actionable pursuant to Section 1983 "only when the state refused to provide a process sufficient to remedy the procedural deprivation." Reams, 561 F.3d at 1266 (citing McKinney v. Pate, 20 F.3d 1550, 1557 (11th Cir. 1994) (*en banc*); Foxy Lady, Inc. v. City of Atlanta, 347 F.3d 1232, 1238 (11th Cir. 2003) ("[E]ven if a procedural deprivation exists ..., such a claim will not be cognizable under § 1983 if the state provides a means by which to remedy the alleged deprivation."); Cotton v. Jackson, 216 F.3d 1328, 1331 (11th Cir. 2000) ("It is the state's failure to provide adequate procedures to remedy the otherwise procedurally flawed deprivation of a protected interest that gives rise to a federal procedural due process claim."). In Cotton, the Eleventh Circuit explained that:

> [t]his rule (that a section 1983 claim is not stated unless inadequate state procedures exist to remedy an alleged procedural deprivation) recognizes that the state must have the opportunity to remedy the procedural failings of its subdivisions and agencies in the appropriate fora-agencies, review boards, and state courts before being subjected to a claim alleging a procedural due process violation.

Cotton, 216 F.3d at 1331 (quotation marks omitted); see Horton v. Bd. of Co. Com'rs of Flagler Co., 202 F.3d 1297, 1300 (11th Cir. 2000) (no federal procedural due process violation under *McKinney* if state courts "generally would provide an adequate remedy for the procedural deprivation the federal court plaintiff claims to have suffered"). And see Reams, 561 F.3d at 1266 (citing same).

Thus, the question is whether the state provided Wade "the means to present her allegations, demonstrate that the [termination] was wrongful, and receive redress from that deprivation." Reams, 561 F.3d at 1266 (citing Narey v. Dean, 32 F.3d 1521, 1527 (11th Cir. 1994)). "To be considered constitutionally adequate, 'the state procedure need not provide all the relief available under section 1983.... Instead, the state procedure must be able to correct whatever

deficiencies exist and to provide plaintiff with whatever process is due.'" Hicks v. Jackson County Com'n, 374 F.Supp.2d 1084, 1092 (N.D. Ala. 2005) (citing Cotton, 216 F.3d at 1331).

In addition to review by the City Council, Wade was afforded, and sought, redress in state court. An Alabama state court is "responsible for reviewing the record *to ensure that the fundamental rights of the parties, including the right to due process, [have] not been violated.*" Evans v. City of Huntsville, 580 So.2d 1323, 1325 (Ala. 1991) (emphasis supplied). Thus, Alabama courts "review employment termination proceedings both to determine whether they are supported by substantial evidence *and to see that the proceedings comport with procedural due process.*" Bell v. City of Demopolis, 86 F.3d 191, 192 (11th Cir. 1996) (citations omitted) (emphasis supplied). Based on this dual review, the Eleventh Circuit has previously held Alabama's writ of *certiorari* to be an adequate post-deprivation remedy for a procedural deprivation. See id. at 192 ("The state offers an adequate remedy in the form of administrative as well as state court review."); Cotton, 216 F.3d at 1331 ("We agree with Defendant that certiorari is generally an adequate state remedy."). Accordingly, Wade's procedural due process claim fails.

Defendants also assert summary judgment is appropriate as to Wade's substantive due process claim, contending Wade's "Complaint is devoid of any specific claim of substantive due process." (Doc. 16 at 16). Wade does not address substantive due process in her response; though her Complaint does assert summarily both procedural and substantive due process claims. (Doc. 5).

"The substantive component of the Due Process Clause protects those rights that are 'fundamental,' that is, rights that are 'implicit in the concept of ordered liberty.'" McKinney, 20 F.3d at 1556. Public employment is not a fundamental right protected by substantive due process. Id. And see Greenbriar Village, L.L.C. v. Mountain Brook City, 345 F.3d 1258, (11th Cir. 2003)

(citing <u>McKinney</u> and reiterating its holding that employment is not a fundamental right so it does not enjoy substantive due process protection). Wade's substantive due process claim therefore fails as a matter of a law.

**E.    <u>Count IV: State Law Tortious Interference</u>**

Wade asserts that Melton tortiously interfered with her "duties and responsibilities as the Selma City Treasurer." (Doc. 21 at 33). Defendants contend Wade fails to state a tortious interference claim under Alabama law and that "at all times the Mayor [Melton] was acting in his capacity as Mayor and within the authority vested in him by statute." (Doc. 16 at 24).

Under Alabama law, "[t]he essential elements of the tort of intentional interference with contractual or business relations are: '(1) the existence of a protectible business relationship; (2) of which the defendant knew; (3) to which the defendant was a stranger; (4) with which the defendant intentionally interfered; and (5) damage.'" <u>Ex parte Hugine</u>, 256 So.3d 30, 60 (Ala. 2017) (citing <u>White Sands Grp., L.L.C. v. PRS II, LLC, 32 So.3d 5, 14 (Ala. 2009)</u>). "The [Alabama] Supreme Court has held that a co-employee of a plaintiff [including a manager of the plaintiff] will be deemed a third party or a stranger to a business or contractual relationship between the plaintiff and the employer only if the co-employee was 'acting outside [his or her] scope of employment and [was] acting with actual malice[11]....'" <u>McGlathery v. Alabama Agr. And Mechanical University,</u> 105 So.3d 437, 447 (Ala. Civ. App. 2012) (citing <u>Hanson v. New Tech., Inc.,</u> 594 So.2d 96, 102 (Ala. 1992); <u>Perlman v. Shurett,</u> 567 So.2d 1296, 1297 (Ala. 1990); <u>Hickman v. Winston Cnty. Hosp. Bd.,</u> 508 So.2d 237, 239 (Ala. 1987)). <u>And</u> <u>see</u> Gelber v. Board

---

[11] Furthermore, in <u>*Perlman,* 567 So.2d at 1298–99,</u> the Alabama Supreme Court held as follows, quoting Justice Adams's special concurrence in <u>*Hickman,* 508 So.2d at 241</u>, "'In interpreting the impact of the newly defined tort in the employee-employer context, we do require that the plaintiff show malice, whereas in the ordinary case only intentional conduct is required.

of Trustees of University of Alabama System, 2017 WL 992145, *4 (N.D. Ala. March 15, 2017)

(citing Pegram v. Hebding, 667 So.2d 696 (Ala. 1995) and Rhodes v. Unisys Corp., 170 Fed.Appx.

681, 685 (11th Cir. 2006)) (accord). The Alabama Supreme Court uses "scope of authority"

interchangeably with the phrase "scope of employment." See e.g., Hanson, 594 So.2d at 102

(holding a co-employee could be liable for intentional interference with contractual relations only

if the co-employee was "acting outside [his or her] scope of employment and [was] acting with

actual malice.").

Assuming Wade can show a malice, to survive summary judgment Wade must also show

Melton acted outside of his authority. See Morrow v. Auburn University of Montgomery, 973

F.Supp. 1392, 1410 (N.D. Ala. 1997) ("If a plaintiff fails to satisfy either of the *Hickman*

elements[--acted outside the scope of his employment or malice--], summary judgment in favor of

the defendant is appropriate.").

Melton was authorized to temporarily remove Wade, subject to City Council review. See

Doc. 20-7 (Section 11-43-81); Doc. 21 at 34 (acknowledging Melton's limited removal authority)).

Thus, Melton acted within his scope of employment each time he removed Wade. Wade did not

specify how Melton acted outside the scope of his authority. See e.g., Hand v. University of

Alabama Board of Trustees, 304 F.Supp.3d 1173, 1184 (N.D. Ala. 2018) (applying Alabama law,

granting defendants' motion to dismiss where plaintiff failed to specify how defendants acted

outside the scope of their authority). Wade seems to assert Melton acted outside the scope of his

authority by removing her after the City Council reinstated her on two separate occasions and by

acting contrary to the Dallas County Circuit Court's injunction against Melton. (Doc. 21 at 13).

Wade has not asserted that the City Council's act of reinstating Wade divested Melton of his

statutory authority to temporarily remove her after reinstatement. See e.g., Rhodes v. Collateral

Mortg., Ltd., 695 So.2d 66, 70 (Ala. Civ. App. 1997) (finding one defendant acted within the scope of her authority where she was authorized to remove plaintiff).

Wade also asserts the other evidence in her response "amply" supports her tortious interference claim, presumably referencing Melton's alleged actions toward Wade that did not result in her removal. These allegations similarly fail to meet the high threshold for demonstrating tortious interference. In Hickman v. Winston County Hosp. Bd., 508 So.2d 237 (Ala. 1987) for example, the plaintiff's supervisors promoted a man the plaintiff trained even though the plaintiff had more seniority, changed the inventory system and instructed other employees not to tell the plaintiff it had been changed, and put unfavorable write-ups in the plaintiff's file while other employees who were involved in the same incidents were not written up. 508 So.2d at 240. Plaintiff's supervisors also told new employees not to listen to the plaintiff, even though she was to train the new employees. Id. Further, the supervisors scheduled plaintiff on Christmas and New Year's Day for three years in a row after she asked not to be scheduled on those days. Id. As a result of all this, the plaintiff suffered health problems and had to quit her job. Id. Nevertheless, the Alabama Supreme Court found that the plaintiff had not presented evidence that the supervisors were acting outside the scope of their authority, so the defendants were entitled to a directed verdict. Id. at 240-41. So too here, Wade fails to demonstrate that Melton acted outside the scope of his authority; summary judgment in favor of Defendants is appropriate. See Hanson, 594 So.2d at 96. And see Morrow, 973 F.Supp. at 1410 ("If a plaintiff fails to satisfy either of the *Hickman* elements[--acted outside the scope of his employment or malice--], summary judgment in favor of the defendant is appropriate.").

IV.    **Conclusion**

Defendants' motion for summary judgment is **GRANTED** as to Counts I (First Amendment Freedom of Speech), III (Fourteenth Amendment Due Process), IV (State Law Tortious Interference) and **DENIED** as to Count II (First Amendment Freedom of Political Association).

**DONE** and **ORDERED** this the  **27th** day of **October 2020.**

/s/Kristi K. DuBose
**KRISTI K. DuBOSE**
**CHIEF UNITED STATES DISTRICT JUDGE**